JANE DOE et al., Appellants-Respondents, v STATE OF NEW YORK, Respondent-Appellant. (Appeal No. 2.) (Claim No. 82265.)

Fourth Department, March 12, 1993

APPEARANCES OF COUNSEL

*Julian & Pertz, P. C.,* Utica *(Richard Pertz* of counsel), for appellants-respondents.

*Michael Buskus,* Albany, for respondent-appellant.

**OPINION OF THE COURT**

FALLON, J.

On August 21, 1988, Jane Doe, a registered nurse at Faxton Hospital in Utica, was stuck by a needle contaminated with the blood of an AIDS patient. The patient, an inmate at Mid-State Correctional Facility, was receiving medication and fluids intravenously. As he became increasingly agitated and irrational, he removed his oxygen mask and dislodged the needle leading to the Hep-Lock port on the intravenous apparatus installed on his left arm. Following a grand-mal seizure apparently induced by a lack of oxygen, the patient became even more combative. While attempting to restrain the patient, the hospital staff requested assistance from two correction officers who were present, but they refused to intervene. After Jane Doe and three of her fellow workers managed to return the patient to his hospital bed, they attempted to apply leather restraints. The patient again became very agitated. Realizing that the contaminated needle was within the patient's grasp, one of the nurses let go of his left leg in an attempt to secure the needle. As she retrieved it, the patient's leg jerked, bumping the nurse's arm and driving the needle into the gloved hand of Jane Doe, who was restraining the patient. Throughout the struggle, the correction officers stood by, clear of the patient's bed, and offered no assistance to the struggling hospital staff.

Jane Doe tested negative for HIV immediately following the incident, but, upon a retest in February of 1989, tested positive for it.

Jane Doe and her husband Joseph Doe commenced this negligence action against the State.[1] After trial, the Court of Claims determined that, based on the failure of the correction

---

1. Joseph Doe asserted a claim in his own right alleging that the State's negligence had exposed him to a risk of HIV contamination. Having determined that the State owed no duty of care to Joseph Doe, the Court of Claims dismissed the claim thereby limiting his recovery to his derivative

officers to intervene in the hospital employees' struggle with the inmate/patient, the State breached its duty to provide reasonable security to the hospital staff and that the State's negligence was the sole proximate cause of claimants' injuries.[2] The Court of Claims awarded Jane Doe a total of $4,354,550 in damages allocated as follows:

Past medical expenses—$1,700

Future medical expenses—$59,000

Pain and suffering to date—$750,000

Loss of wages—$43,850

Future pain and suffering—$3,500,000.

The court awarded Joseph Doe $1,016,642 in damages allocated as follows:

Past loss of consortium—$250,000

Future loss of household services—$16,642

Future loss of consortium—$750,000.

The court denied in part Jane Doe's claim for future economic loss, without prejudice to the right of her distributees to maintain a wrongful death action for pecuniary loss subsequent to her death.

On appeal, claimants contend that the court erred in failing to make a complete award for future economic loss. In addition, they contend that CPLR article 50-B is unconstitutional and that its application under these circumstances violates the Americans with Disabilities Act of 1990 (42 USC § 12101 *et seq.).* The State contends in its cross appeal that the damage awards made to Jane Doe for pain and suffering and to Joseph Doe for loss of consortium are excessive, but concedes that the court erred in failing to make a complete award for Jane Doe's future economic loss.

claim for past and future loss of consortium and loss of services. As limited by his brief, Joseph Doe does not appeal the court's denial of his independent claim for damages.

2. The State's cross appeal is limited to issues related to the court's damage award, liability having been conceded.

THE AWARD FOR JANE DOE'S PAST AND FUTURE PAIN AND SUFFERING.

■ Although it acknowledges that the negligence in the instant case was "extreme" and the tragedy "preventable", the State contends that the $4,250,000 aggregate award made for Jane Doe's past ($750,000) and future ($3,500,000) pain and suffering is excessive. Relying on academic commentary, the State contends that we should scrutinize verdicts that might have been inflated by passion and sympathy and maintain their proportionality by recognizing that no amount of money can undo most injuries (see generally, Newman, *Damages: A Call for Meaningful Precedents,* 3 Pace L Rev 605 [1983]; Louis, *Allocating Adjudicative Decision Making Authority Between The Trial And Appellate Levels: A Unified View Of The Scope of Review, The Judge/Jury Question, And Procedural Discretion,* 64 NC L Rev 993 [1986]). The State proposes that $2,750,000 would reasonably compensate Jane Doe for her past and future pain and suffering and that $250,000 would fairly compensate Joseph Doe for his derivative claim.

Expert testimony adduced at trial established that the average individual infected with HIV will develop full-blown AIDS within eight to 10 years following seroconversion.[3] Jane Doe's physician testified that her condition appears to be progressing more rapidly than most. Based upon that testimony, the court determined that Jane Doe would be likely to develop AIDS within the next four or five years and that her reasonable life expectancy would be through 1997. The court further determined that Jane Doe would suffer for a 14-month period from one or more of the "opportunistic illnesses" which define AIDS, and would thereafter die. Dr. Saah, one of claimants' medical experts, testified that, because of the inability of Jane Doe's immune system to fight off infection, she will develop one, and perhaps several, of the opportunistic infections that ultimately will cause her death. Based on his experience with AIDS patients, Dr. Saah expects that a great deal of suffering will attend her death. He testified that AIDS patients "don't drop dead. They die one cell at a time. They die weighing ninety pounds * * * looking like they came out of Auschwitz. It's a very slow death".

Dr. Saah further testified that there is considerable psychological and emotional pain associated with AIDS. Jane Doe's

---

3. Seroconversion occurs when the blood first tests positive for HIV.

past and future pain and suffering can be traced to the contaminated needle stick and the later discovery that she was HIV positive. Jane Doe also is aware that, because of her lessened life expectancy, she will not see her children grow up. Furthermore, she must contend with the stigma attached to people with AIDS; indeed, because of societal attitudes towards AIDS and the fear of ostracism, claimants have had to suffer alone. Moreover, because the virus may be sexually transmitted, Jane Doe's interaction with her husband has been significantly altered. She now lives with the added fear that she might infect him with HIV.

Based on the above, we do not find that the award made for Jane Doe's past and future pain and suffering deviates materially from what would be reasonable compensation (see, CPLR 5501 [c]).

### THE AWARD FOR JOSEPH DOE'S LOSS OF CONSORTIUM.

Claimants Jane and Joseph Doe were married in 1969 and have three children. The record supports the court's findings that the Does are a close-knit family, sharing considerable affection and love for one another, and that Jane Doe provided a variety of services as wage-earner, homemaker, spouse and mother, of which Joseph Doe will be deprived during her suffering and upon her death from AIDS. There was testimony that they engaged in unprotected sex two or three times a week following the August 21, 1988 incident through the date that she tested HIV positive in March of 1989, and that the quality and extent of their sexual practices has now been drastically altered because of Jane Doe's infection. The Does live with the constant fear that their continued sexual activity creates a risk of infection to Joseph Doe.

With respect to Joseph Doe's future loss of consortium, the court noted: "Mr. Doe's marital life in the coming five years will simply and utterly be destroyed. The worst is yet to come. For the immediate future, he will continue to have to deal with their day-to-day frustrations of not being able to talk freely, to share their lives free of inhibition. Always looming over his time with her is the impression he has that their time together is limited and any moment could be the beginning of the end of their time together * * * Mr. Doe will gradually have to suffer the experience of her slowly drifting and wasting away, providing him no more comfort or affection until the day she dies." (155 Misc 2d 286 [partially published].)

The court's award of $250,000 for past and $750,000 for future loss of consortium reflects the emotional, physical and financial contributions that Jane Doe has made during the course of the marriage, including the services she has rendered in caring for the household and assisting with their children. It reflects the fact that Joseph Doe will be left to perform the tasks that Jane Doe had previously performed, and that he alone will have to provide for his family's emotional well-being. On this record, it cannot be said that the award deviates materially from what would be reasonable compensation (see, CPLR 5501 [c]).

### JANE DOE'S FUTURE ECONOMIC LOSS.

At trial, claimants sought to recover for Jane Doe's future economic damages consisting of her lost wages, her impairment of earning potential, and the value of her services as a homemaker to her husband and children. Claimants' expert, an economist, testified that, based upon specified assumptions,[4] the present value of Jane Doe's lost wages amounted to $387,889, assuming she worked through her 58th year, or $560,250, assuming she worked until she was 64 years of age. $123,255 was added to the income figure to represent the value of Jane Doe's projected fringe benefits. In addition, claimants' expert testified that the value of Jane Doe's services as a homemaker over the course of Joseph Doe's life expectancy was $317,962.

The State countered by submitting the testimony of its own economist, who opined that the present value of Jane Doe's future lost wages was $308,006, assuming a "normal" work-life expectancy until claimant was 56 years of age.[5] Allowing 22% of income for fringe benefits and then offsetting 26% to account for Jane Doe's personal consumption of the income she would have earned over that period of time, the State's economist fixed the total lost-wage component of Jane Doe's future economic loss at $226,998. According to the State's expert, $252,558 reflects the value of the lost household ser-

---

4. Claimants' economist assumed that Jane Doe was 42 years of age, that she had been married 20 years, that she and her husband had three dependent children then aged 18, 15 and 10 years, that her 1991 earnings were $29,616, that Jane Doe would cease working in 1996 due to disability from AIDS and that Jane Doe had a work-life expectancy from 18 to 24 years.

5. The State's economist also assumed for purposes of his computation that Jane Doe would cease working altogether in 1996.

vices component of Jane Doe's claim. Subject to the provisions of CPLR article 50-B, the State maintains that Jane Doe is entitled to a future pecuniary damage award of $479,556.

In considering Jane Doe's claim for future economic damages, the court limited her recovery to only those damages she was expected to suffer in her lifetime. Having determined that Jane Doe faced an imminent and certain death from AIDS, the court was unwilling to make an award for the economic loss proximately caused by defendant's negligence beyond her reasonable postinjury life expectancy; the court stated that her distributees could bring a wrongful death action upon her death. That was error.

It is well established that loss of income, including diminished future earning capacity, is a proper element of damages in a personal injury action *(see, Weir v Union Ry. Co.,* 188 NY 416, 418). Indeed, "a tort victim suing for damages for permanent injuries is permitted to base his recovery 'on his prospective earnings for the balance of his life expectancy at the time of his injury *undiminished by any shortening of that expectancy as a result of the injury'* [citation omitted]" *(Sea-Land Servs. v Gaudet,* 414 US 573, 594).

The Court of Claims erred in limiting Jane Doe's future economic loss to her postinjury life expectancy *(see,* Restatement [Second] of Torts § 924, comment *c,* at 524-526). Only an award based on one's preinjury life expectancy truly reflects the injured party's actual loss (7A Warren's, New York Negligence, Personal Injuries, § 7.04 [1], at 416-417 [4th ed 1984]). To hold otherwise would in effect reward defendant for having successfully injured Jane Doe severely enough to shorten her life span *(Rummo v Celotex Corp.,* 726 F Supp 426, 428 [ED NY 1989]). Thus, we conclude that, where the proof in the record permits the loss to be ascertained with reasonable certainty *(see, Askey v Occidental Chem. Corp.,* 102 AD2d 130, 136), damages attributable to an injured person's lost earning capacity due to injury must be awarded directly to that person during his or her lifetime utilizing a preinjury life expectancy. That rule must apply in those situations where, as here, an actual shortened life expectancy can be determined prior to death *(see, Rummo v Celotex Corp., supra,* at 428-429).

The court's determination that Jane Doe's distributees could be compensated for any such loss by bringing a wrongful death action was erroneous. It is axiomatic that her distributees could maintain an action for wrongful death only if she had a right of recovery for personal injuries at the time of her

death *(see,* EPTL 5-4.1; *Fontheim v Third Ave. Ry. Co.,* 257 App Div 147, 149, *appeal dismissed* 289 NY 624). In view of this action and the satisfaction of judgment obtained herein, no such right of recovery remains *(see, Fontheim v Third Ave. Ry. Co., supra,* at 149; *see also, Littlewood v Mayor of City of N. Y.,* 89 NY 24, 32; *McDaniel v Clarkstown Cent. School Dist. No. 1,* 110 AD2d 349, 353, *appeal dismissed* 67 NY2d 918; *see also,* Annotation, *Judgment in Favor of, or Adverse to, Person Injured as Barring Action For His Death,* 26 ALR4th 1264, 1268-1271). The fact that the elements and amounts of recovery could be different if determined under EPTL 5-4.1 and 11-3.3 is irrelevant.

The economic and medical proof in the record is sufficient for us to determine the amount of damages to compensate Jane Doe adequately for her future economic loss. Based on that proof, we find that Jane Doe, who was 42 years of age at the time of trial and earning approximately $30,000 annually, will likely become completely disabled from AIDS in 1996. We further find that she has a reasonable work-life expectancy as a registered nurse through the age of 58. Utilizing the calculations offered by the economists and making allowances for lost fringe benefits as a percentage of income and without any adjustment for Jane Doe's personal consumption *(but see, Milbrandt v Green Refractories Co.,* 79 NY2d 26, 32, n 1), we determine that the impairment of earnings and lost wage component of Jane Doe's future economic loss is $450,000. Additionally, we determine that the value of Jane Doe's services as a homemaker is $275,000. Thus, the judgment should be modified to provide for such an award and the matter remitted to the Court of Claims for purposes of determining the amount of the judgment to be entered pursuant to article 50-B *(see,* CPLR 5041 [e]).[6]

CONSTITUTIONALITY AND APPLICABILITY OF CPLR ARTICLE 50-B.

█ Because the future damage awards made to both claim-

---

6. For purposes of making the calculation required by CPLR 5041 (e), we find, as did the Court of Claims, that the award is intended to compensate Jane Doe for a period of 5.5 years. There is no need to adjust our award for Jane Doe's impairment of earnings and lost wages to reflect those damages awarded by the court through her anticipated date of death; our award is intended to compensate her from that date forward throughout the remainder of what we have determined to be her reasonable life expectancy had the injury not occurred.

ants exceed $250,000, the court was required to structure the judgment pursuant to CPLR article 50-B (see, Hill v Muchow, 178 AD2d 954, 955). After making necessary adjustments for payment of litigation expenses and attorneys' fees (see, CPLR 5041 [c]; see also, Brown v State of New York, 184 AD2d 126), the court entered judgment on the remainder of the future damage awards to Jane and Joseph Doe in excess of $250,000 "for the amount of the present value of an annuity contract that will provide for the payment of the remaining amounts of future damages in periodic installments" (CPLR 5041 [e]). In the case of Joseph Doe, the judgment provides for a lump-sum payment of $663,878.63 and periodic annual payments of $59,894.03 increased 4% annually as provided for by statute and payable over 5.5 years. The amended judgment[7] in favor of Jane Doe provides for a lump-sum payment of $2,067,195.23 and total annual periodic payments of $389,794.93. We note that the structured judgment was entered upon claimants' application to settle the terms of the judgment pursuant to CPLR article 50-B. Claimants also moved after trial to have the total award paid in a lump sum and for a declaration that article 50-B was unconstitutional and that it violated the Americans with Disabilities Act.[8] We now turn to the merits of those claims.

Claimants contend that the periodic payment provision of article 50-B requiring future damage awards in excess of $250,000 to be paid over a period of time instead of in one lump sum deprives them of their property without due process of law. They also maintain that the failure of the article to define "discount rate" (CPLR 5041 [e]) renders it impermissibly vague and makes consistent implementation of the article impossible. We disagree. A legislative enactment is deemed to

---

7. The amended judgment merely segregates the components of the future payments to be made to Jane Doe into those that were intended to compensate her for future pain and suffering and medical expenses, which terminate upon the death of the judgment creditor (see, CPLR 5045 [a]), from the award made for her future lost wages through the date of death, which do not. Concerning the latter payments, CPLR 5045 (b) provides where pertinent that "[t]he portion of any periodic payment allocable to loss of future earnings shall not be reduced or terminated by reason of the death of the judgment creditor, but shall be paid to persons to whom the judgment creditor owed a duty of support immediately prior to his death to the extent that such duty of support exists under applicable law at the time of the death of the judgment creditor".

8. The Court of Claims did not decide either application. The court's entry of judgment pursuant to article 50-B constitutes implicit denial of them.

be constitutional until those challenging it have satisfied the court to the contrary *(Montgomery v Daniels,* 38 NY2d 41, 54). " 'There is generally a very strong presumption that "the Legislature has investigated and found the existence of a situation showing or indicating the need for or desirability of the legislation" ' " *(Montgomery v Daniels, supra,* at 54, quoting *Matter of Taylor v Sise,* 33 NY2d 357, 364, quoting *Matter of Van Berkel v Power,* 16 NY2d 37, 40). Article 50-B, enacted as part of the Toxic Tort Act (L 1986, ch 682), was intended to maintain the moderate cost of liability insurance premiums, while assuring adequate compensation for tort victims throughout the entire period of their loss *(see, Insuring Our Future,* Report of Governor's Advisory Comm on Liab Ins, at 156-158 [Apr. 7, 1986]; Governor's Approval Mem, L 1986, ch 682, 1986 NY Legis Ann, at 289; Governor's Program Mem, L 1985, ch 294, 1985 NY Legis Ann, at 132 [comparable language in CPLR art 50-A]; *see also, Alisandrelli v Kenwood,* 724 F Supp 235, 238 [SD NY 1989]). Because we find that the Legislature was acting in furtherance of permissible State objectives and that the means adopted in article 50-B reasonably relate to their accomplishment *(see, Montgomery v Daniels, supra,* at 54), we conclude that the abolition of the right of a tort victim to receive an award for future damages in a lump sum does not deprive that victim of a right or interest protected by the Due Process Clause of our State Constitution *(see,* NY Const, art I, § 6).[9]

Claimants' contention that CPLR article 50-B is unconstitutionally vague because it fails to define the term "discount rate" also is without merit. Although the void-for-vagueness doctrine is the "first essential of due process" *(Connally v General Constr. Co.,* 269 US 385, 391), "statutes are not automatically invalidated on the ground[s] of vagueness simply because of [a] difficulty in determining whether certain

---

9. For the same reason, we reject claimants' contention that article 50-B deprives Jane Doe's distributees of property without due process of law because it fails to ensure that any unpaid future economic loss accruing upon her death will go to the same individuals who would have had a statutory cause of action for wrongful death to recover for their pecuniary loss *(see,* EPTL 5-4.4). As was noted in *Montgomery v Daniels (supra),* the Legislature may alter or abolish existing rules of recovery provided it acts reasonably. In the event that Jane Doe dies prior to payment of all the periodic payments allocated to loss of future earnings, Joseph Doe, their children or "any party in interest" may apply to the Court of Claims to modify the judgment to award and apportion future payments (CPLR 5045

marginal activities fall within the scope of the statutory regulations" *(Wegman's Food Mkts. v State of New York,* 76 AD2d 95, 101). Due process requires only a reasonable degree of certainty so that individuals of ordinary intelligence are not left to guess at the meaning of a given statutory term *(Foss v City of Rochester,* 65 NY2d 247, 253). It is incumbent upon parties challenging enactments to show "that the statutory language is so indefinite that they could not have reasonably understood" them *(State of New York v Rutkowski,* 44 NY2d 989, 991).

Because we find that the term "discount rate" as used in CPLR article 50-B can be determined with reasonable certainty, we conclude that the enactment is not unconstitutionally vague *(see, Foss v City of Rochester, supra,* at 253). The fact that a number of trial courts have applied different discount rates in structured judgment determinations does not, in our view, render the enactment unconstitutionally vague *(see, e.g., Rohring v City of Niagara Falls,* 153 Misc 2d 1001; *Peterson v Zuercher,* 152 Misc 2d 684; *Ursini v Sussman,* 143 Misc 2d 727 [construing comparable provision in CPLR art 50-A]; *see also, Marulli v Pro Sec. Serv.,* 151 Misc 2d 1077 [App Term, 2d Dept]). In providing that present value determinations are to be made "in accordance with generally accepted actuarial practices by applying the discount rate in effect at the time of the award" (CPLR 5041 [e]), the Legislature merely provided for a flexible approach to such determinations, an approach not uncommon in previous practice *(see, e.g.,* 1 NY PJI2d 647-648). Moreover, although claimants asserted that the term "discount rate" is confusing and impossible to implement with any consistency, their economist determined that a value of 6% was appropriate.

We reject claimants' contention that application of article 50-B to their award violates the Americans with Disabilities Act. We note at the outset that article 50-B applies to *all* tort victims and not only to those suffering from a disability enumerated in the Act. In addition, the Act was intended to prevent discrimination by reason of such a disability in employment, the provision of public services and public accommodation, and access to buildings and transportation *(see,* 42 USC § 12101 [a] [3]; §§ 12111-12117 [employment], 12131-12165 [public services], 12181-12189 [public accommodations]; HR Rep No. 485 [I], 101st Cong, 2d Sess, reprinted in 1990 US Code Cong & Admin News 268-269). Assuming, arguendo, that the Act applies to a situation such as presented by this case,

its provisions are not implicated here because there is no causal nexus between the alleged discriminatory action and the disabled individual's disability *(see, Teahan v Metro-N. Commuter R. R. Co.,* 951 F2d 511, 516-517 [2d Cir 1991], *cert denied* — US —, 121 L Ed 2d 24; *see also, Severino v North Fort Myers Fire Control Dist.,* 935 F2d 1179, 1182-1183 [11th Cir 1991] [causation requirement of similar language found in Rehabilitation Act of 1973 (29 USC § 794)]).

Accordingly, the judgment should be modified to provide Jane Doe with an award for all her future economic loss (impairment of earnings and lost wages of $450,000 and services as a homemaker of $275,000) and the matter remitted to the Court of Claims for purposes of determining the amount of the judgment to be entered pursuant to article 50-B.

PINE, J. P., BOOMER, DAVIS and BOEHM, JJ., concur.

Judgment unanimously modified, on the law and facts, and as modified, affirmed, without costs, and matter remitted to Court of Claims for further proceedings in accordance with the opinion by FALLON, J.